IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HERBERT C. OWENS, | ) | CASE NO. 1:16 CV 1220 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## Introduction

Before me by referral[1] is an action for judicial review of the final decision of the Commissioner of Social Security denying the applications of the plaintiff, Herbert C. Owens, for disability insurance benefits and supplemental security income.[2] The Commissioner has answered[3] and filed the transcript of the administrative record.[4]  Under my initial[5] and

---

[1] This matter was referred to me under Local Rule 72.2 in a non-document order dated May 20, 2016.

[2] ECF # 1.

[3] ECF # 9.

[4] ECF # 10.

[5] ECF # 6.

procedural[6] orders the parties have briefed their positions.[7] and filed supplemental charts[8] and the fact sheet.[9]  They have participated in a telephonic oral argument.[10]

**A.**    **Background facts and decision of the Administrative Law Judge ("ALJ")**

Owens who was 53 years old at the time of the administrative hearing,[11] has a twelfth grade education[12] and is not married.[13]  His past relevant employment history includes work as a furniture, auto, and television/cable dish salesman.[14]

The Administrative Law Judge ("ALJ"), whose decision became the final decision of the Commissioner, found that Owens had severe impairments consisting of residual type schizophrenic disorder/schizoaffective disorder; paranoid personality disorder; major depression with psychotic features (20 CFR 404.1520(c) and 416.920(c)).[15] The ALJ made the following finding regarding Owens's residual functional capacity:

---

[6] ECF # 11.

[7] ECF # 12-1 (Owens's brief), ECF #18 (Commissioner's brief), ECF # 19 (Owens's reply brief).

[8] ECF # 18-1 (Commissioner's charts); ECF # 12-4 (Owens's charts).

[9]  ECF # 12-3.

[10] ECF # 22.

[11] ECF # 10, Transcript ("Tr.") at 45.

[12] *Id.* at 21.

[13] *Id*. at 233.

[14] *Id.* at 21.

[15] *Id*. at 22.

The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to perform simple and multi-step tasks (1-to 3- step tasks) in a static environment.  The claimant is limited to work where tasks can be completed individually and with minimal contact with the public.  The claimant is limited to superficial interaction with others.[16]

Given that residual functional capacity, the ALJ found Owens incapable of performing his past relevant work as a furniture salesman, auto salesman, and television/cable dish salesman.[17] Applying the medical-vocational grids in Appendix 2 of the regulations, the ALJ found Owens not under a disability.[18]

Based on an answer to a hypothetical question posed to the vocational expert at the hearing setting forth the residual functional capacity finding quoted above, the ALJ determined that a significant number of jobs existed locally and nationally that Owens could perform.[19]

**B.      Issues on judicial review**

Owens asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record. Specifically, Owens presents the following issues for judicial review:

- Whether the ALJ failed to properly evaluate the opinion evidence of record. Specifically, the ALJ violated SSR 06-3p in his evaluation of "other source,"

---

[16] *Id.* at 24.

[17] *Id*. at 30.

[18] *Id*. at 31.

[19] *Id*. at 30.

he improperly evaluated the opinions of the state agency examiner and consultants, and he cursorily dismissed the GAF scores of record.[20]

•     Whether the ALJ improperly evaluated the evidence of the treating physician of record. The ALJ failed to find any severe physical impairments despite the supporting evidence from the treating source. The ALJ also erred by relying on the state agency physicians who in turn erred in evaluating this claim with an incorrect date last insured.[21]

The Court recommends that the ALJ's finding of no disability is not supported by substantial evidence and, therefore, should be reversed and remanded for further administrative proceedings.

## Analysis

### A.     Applicable legal principles

### 1.     *Substantial evidence*

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant

---

[20] ECF #12-1 at 2.

[21] *Id.*

evidence as a reasonable mind might accept as adequate to support a conclusion.' "

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[22]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner survives "a directed verdict" and wins.[23] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[24]

I will review the findings of the ALJ at issue here consistent with that deferential standard.

## 2.     *The treating source rule*

The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances.

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from

---

[22] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

[23] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06CV403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[24] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

> objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[25]

If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight.[26]

The ALJ has the ultimate responsibility for determining whether a claimant is disabled.[27] Conclusory statements by the treating source that the claimant is disabled are not entitled to deference under the regulation.[28]

The regulation does cover treating source opinions as to a claimant's exertional limitations and work-related capacity in light of those limitations.[29] Although the treating source's report need not contain all the supporting evidence to warrant the assignment of controlling weight to it,[30] nevertheless, it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" to receive such weight.[31] In deciding if such

---

[25] 20 C.F.R. § 404.1527(d)(2).

[26] *Id.*

[27] *Schuler v. Comm'r of Soc. Sec.*, 109 F. App'x 97, 101 (6th Cir. 2004).

[28] *Id.*

[29] *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 991 (N.D. Ohio 2003), citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2nd Cir. 2003).

[30] *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).

[31] *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001).

-6-

supporting evidence exists, the Court will review the administrative record as a whole and may rely on evidence not cited by the ALJ.[32]

In *Wilson v. Commissioner of Social Security*,[33] the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination.[34] The court noted that the regulation expressly contains a "good reasons" requirement.[35] The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.

- Identify evidence supporting such finding.

- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.[36]

The court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error.[37] It drew a distinction between a

---

[32] *Id.* at 535.

[33] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

[34] *Id.* at 544.

[35] *Id.*, citing and quoting 20 C.F.R. § 404.1527(d)(2).

[36] *Id.* at 546.

[37] *Id.*

regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business.[38] The former confers a substantial, procedural right on the party invoking it that cannot be set aside for harmless error.[39] It concluded that the requirement in § 1527(d)(2) for articulation of good reasons for not giving controlling weight to a treating physician's opinion created a substantial right exempt from the harmless error rule.[40]

The Sixth Circuit in *Gayheart v. Commissioner of Social Security*[41] recently emphasized that the regulations require two distinct analyses, applying two separate standards, in assessing the opinions of treating sources.[42] This does not represent a new interpretation of the treating physician rule. Rather it reinforces and underscores what that court had previously said in cases such as *Rogers v. Commissioner of Social Security*,[43] *Blakley v. Commissioner of Social Security*,[44] and *Hensley v. Astrue*.[45]

---

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013).

[42] *Id.* at 375-76.

[43] *Rogers*, 486 F.3d at 242.

[44] *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009).

[45] *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009).

As explained in *Gayheart*, the ALJ must first consider if the treating source's opinion should receive controlling weight.[46] The opinion must receive controlling weight if (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the administrative record.[47] These factors are expressly set out in 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Only if the ALJ decides not to give the treating source's opinion controlling weight will the analysis proceed to what weight the opinion should receive based on the factors set forth in 20 C.F.R. §§ 404.1527(d)(2)(i)-(ii), (3)-(6) and §§ 416.927(d)(2)(i)-(ii), (3)-(6).[48] The treating source's non-controlling status notwithstanding, "there remains a presumption, albeit a rebuttable one, that the treating physician is entitled to great deference."[49]

The court in *Gayheart* cautioned against collapsing these two distinct analyses into one.[50] The ALJ in *Gayheart* made no finding as to controlling weight and did not apply the standards for controlling weight set out in the regulation.[51] Rather, the ALJ merely assigned the opinion of the treating physician little weight and explained that finding by the secondary

---

[46] *Gayheart*, 710 F.3d at 376.

[47] *Id.*

[48] *Id.*

[49] *Rogers*, 486 F.3d at 242.

[50] *Gayheart*, 710 F.3d at 376.

[51] *Id.*

criteria set out in §§ 1527(d)(i)-(ii), (3)-(6) of the regulations,[52] specifically the frequency of the psychiatrist's treatment of the claimant and internal inconsistencies between the opinions and the treatment reports.[53] The court concluded that the ALJ failed to provide "good reasons" for not giving the treating source's opinion controlling weight.[54]

> But the ALJ did not provide "good reasons" for why Dr. Onady's opinions fail to meet either prong of this test.

> To be sure, the ALJ discusses the frequency and nature of Dr. Onady's treatment relationship with Gayheart, as well as alleged internal inconsistencies between the doctor's opinions and portions of her reports. But these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight.[55]

In a nutshell, the *Wilson/Gayheart* line of cases interpreting the Commissioner's regulations recognizes a rebuttable presumption that a treating source's opinion should receive controlling weight.[56] The ALJ must assign specific weight to the opinion of each treating source and, if the weight assigned is not controlling, then give good reasons for not giving those opinions controlling weight.[57] In articulating good reasons for assigning weight other than controlling, the ALJ must do more than state that the opinion of the treating

---

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Rogers*, 486 F.3d 234 at 242.

[57] *Blakley*, 581 F.3d at 406-07.

-10-

physician disagrees with the opinion of a non-treating physician[58] or that objective medical evidence does not support that opinion.[59]

The failure of an ALJ to follow the procedural rules for assigning weight to the opinions of treating sources and the giving of good reason for the weight assigned denotes a lack of substantial evidence even if the decision of the ALJ may be justified based on the record.[60] The Commissioner's *post hoc* arguments on judicial review are immaterial.[61]

Given the significant implications of a failure to properly articulate (*i.e.*, remand) mandated by the *Wilson* decision, an ALJ should structure the decision to remove any doubt as to the weight given the treating source's opinion and the reasons for assigning such weight. In a single paragraph the ALJ should state what weight he or she assigns to the treating source's opinion and then discuss the evidence of record supporting that assignment. Where the treating source's opinion does not receive controlling weight, the decision must justify the assignment given in light of the factors set out in §§ 1527(d)(1)-(6).

The Sixth Circuit has identified certain breaches of the *Wilson* rules as grounds for reversal and remand:

---

[58] *Hensley*, 573 F.3d at 266-67.

[59] *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-52 (6th Cir. 2010).

[60] *Blakley*, 581 F.3d at 407.

[61] *Wooten v. Astrue*, No. 1:09-cv-981, 2010 WL 184147, at *8 (N.D. Ohio Jan. 14, 2010).

- the failure to mention and consider the opinion of a treating source,[62]

- the rejection or discounting of the weight of a treating source without assigning weight,[63]

- the failure to explain how the opinion of a source properly considered as a treating source is weighed (*i.e.*, treating v. examining),[64]

- the elevation of the opinion of a nonexamining source over that of a treating source if the nonexamining source has not reviewed the opinion of the treating source,[65]

- the rejection of the opinion of a treating source because it conflicts with the opinion of another medical source without an explanation of the reason therefore,[66] and

- the rejection of the opinion of a treating source for inconsistency with other evidence in the record without an explanation of why "the treating physician's conclusion gets the short end of the stick."[67]

The Sixth Circuit in *Blakley*[68] expressed skepticism as to the Commissioner's argument that the error should be viewed as harmless since substantial evidence exists to support the ultimate finding.[69] Specifically, *Blakley* concluded that "even if we were to agree

---

[62] *Blakley*, 581 F.3d at 407-08.

[63] *Id.* at 408.

[64] *Id.*

[65] *Id.* at 409.

[66] *Hensley*, 573 F.3d at 266-67.

[67] *Friend*, 375 F. App'x at 551-52.

[68] *Blakley*, 581 F.3d 399.

[69] *Id.* at 409-10.

-12-

that substantial evidence supports the ALJ's weighing of each of these doctors' opinions, substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(d)(2) as harmless error."[70]

In *Cole v. Astrue*,[71] the Sixth Circuit reemphasized that harmless error sufficient to excuse the breach of the treating source rule only exists if the opinion it issues is so patently deficient as to make it incredible, if the Commissioner implicitly adopts the source's opinion or makes findings consistent with it, or if the goal of the treating source regulation is satisfied despite non-compliance.[72]

## B.    Recommendation

This case presents multiple challenges to the ALJ's finding as to Owens's mental impairment and a more straightforward issue arising from the determination of Owens's physical limitations. I will address the arguments concerning mental limitations first, and then consider the physical limitations.

### 1.    *Mental limitation*

Owens contends that in addressing his mental limitations the ALJ:

(a) improperly discounted the opinions of Linda Kimble, RN, who had treated Owens;[73]

---

[70] *Id.* at 410.

[71] *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011).

[72] *Id.* at 940.

[73] ECF # 12-1 at 7-13.

(b) improperly identified the status, and then gave undue weight to, the opinion of Dr. Thomas Parks, M.D., a treating psychiatrist;[74]

(c) improperly relied on the opinions of state agency reviewing consultants and then failed to incorporate all their limitations in the RFC;[75]

(d) was unclear in how he weighed and to what degree he relied on the opinion of Richard Davis, Ph.D., an examining psychologist;[76]

(e) failed to consider numerous GAF scores as "opinion evidence" and improperly rejected them as inconsistent with the record.[77]

a.    *Nurse Kimble*

The initial issue as to the treatment of Nurse Kimble centers on Owens's argument that the ALJ failed to give good reasons for discounting Kimble's functional capacity opinion.[78]  Owens asserts that the "ALJ's discussion of Ms. Kimble's opinions is unreviewable and not supported by substantial evidence" because that conclusion by the ALJ was essentially "cursory" and failed to address relevant facts in the record that supported Kimble's views.[79]

---

[74] *Id.* at 13-14.

[75] *Id*. at 14-16.

[76] *Id*. at 16-17.

[77] *Id*. at 17-20.

[78] *Id*. at 8-9.

[79] *Id*. at 10-11.

-14-

The ALJ here analyzed Nurse Kimble's opinions by noting that she is not an acceptable medical source under the regulations, and further observing that her opinion as a treating nurse practitioner was not co-signed by a psychiatrist.[80]  From that, the ALJ's reasoning was "conclusory" in that the ALJ found, without elaboration, that the limitations in Nurse Kimble's opinions were "not supported by the objective medical evidence in the file" and, also without contemporaneous explanation, that Nurse Kimble "apparently" relied "quite heavily" on "subjective reports" of symptoms and limitations provided by Owens, while not crediting "good reasons for questioning" Owens's reliability.[81]

While it is true that as a non-acceptable source Nurse Kimble's opinions were not subject to a specified analytical protocol or deference,[82] it is also true that an ALJ must consider all the evidence of record and generally should explain the weight given to opinions from "other" sources.[83]  Here, although the Commissioner in his brief attempts to marshal a significant number of citations to the record purporting to show - in detail - how Nurse Kimble's opinions are at variance with portions of the record,[84] none of these citations are found in the ALJ's opinion. As such, they represent the Commissioner's own *post hoc* reasoning for discounting the opinions of Nurse Kimble and not reasons put forth by the ALJ.

---

[80] Tr. at 28.

[81] *Id.*

[82] *See, Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 530 (6th Cir. 1997).

[83] SSR 06-03p.

[84] ECF # 18 at 11-13.

-15-

Because this Court must review only the decision and supporting reasons given by the ALJ and not those advanced at a later date by the Commissioner,[85] The absence of any articulated detail in the reasoning of  the ALJ does render this portion of the decision difficult to review in a meaningful way.[86]

That said, however, regardless of the weight assigned to Nurse Kimble's opinions and the process followed in assigning such weight, any error here would be harmless. In particular, and as will be discussed below, the functional opinions of Drs. Park and Brown, as well as those of the state agency reviewers, support the RFC as found in this matter.

b.      *Dr. Park*

Owens contends that the ALJ erred in describing Dr. Park as a treating source because Dr. Park had only met twice with Owens,[87]  In this regard I note, as I did in *Montanez v. Commissioner of Social Security*,[88] that "merely taking note of the number of visits by itself is not enough to show either that the contacts are sufficient to establish a treating relationship or that conclusively they are not."[89]  As oberved in *Montanez*, courts recognize that "a

---

[85] *See, Wooten v. Astrue*, 2010 WL 184147 (N.D. Ohio Jan. 14, 2010).

[86] In so noting, there is no requirement in the regulations "for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'"*Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio Jan. 30, 2012).

[87] ECF # 12-1 at 13.

[88] *Montanez v. Comm'r of Soc. Sec.*, No.1:13 CV 614, 2013 WL 6903764 (N.D. Ohio Dec. 12, 2013).

[89] *Id*. at * 8 (citation omitted).

-16-

psychiatrist may prescribe and manage medications while not seeing a patient with any regularity," instead relying on information received from others with more direct contact with the patient, such as nurse practitioners.[90]  Indeed, as noted in *Shy v. Commissioner of Social Security,*[91] the regulations as to treating sources "direct that the district court look to the acceptable medical practice for the type of treatment under review" in the claimant's case.[92]

Here, as was pointed out by the Commissioner,[93] the relatively limited number of visits with Dr. Parks was not the result of Owens searching out a physician simply to generate a disability opinion.[94]  Rather, as the treatment notes indicate, Owens was seen eight times by two psychiatrists at Mental Health Services - Dr. Parks and Dr. Abraham - from the period March of 2013 through March of 2015.[95]  This history clearly demonstrates an on-going treating relationship with the psychiatric professionals at a single clinical location over a period of two years[96] and, therefore, is not analogous to those cases where

---

[90] *Id.*

[91]  *Shy v. Comm'r of Soc. Sec.*, No.1:14 CV 2544,  2016 WL 775299 (N.D. Ohio Feb. 19, 2016).

[92] *Id.* at * 6.

[93] ECF # 18 at 15.

[94] ECF # 12-1 at 13 (citing *Boucher v. Apfel*, 2000 WL 1769520 (6th Cir. Nov. 15, 2000).

[95] *See*, tr. at 370-72, 387, 388-89, 390, 392, 444, 445, 446.

[96] This continuity with one clinical practice is precisely how the ALJ described Owens's treatment, from the observation that he "began treating at Mental Health Services (MHS) on March 18, 2013" [tr. at 25] to the notation that in May 2013 Owens had "a follow-up visit at Mental Health Services" with Dr. Parks [*id*. at 27] before "return[ing] too MHS"

courts have found an insufficient basis to conclude that the treating relationship has been long enough to yield "a longitudinal picture of [the claimant's] medical impairments."[97]

Further, as was discussed above, the number of visits in this case, as noted, seems consistent with the "acceptable medical practice" for outpatient psychiatric care, and so would not disqualify Dr. Parks from being considered a treating source by the ALJ. Accordingly, there was no error in designating Dr. Parks as a treating source in this case.

Also there was no error in the ALJ giving significant weight to the functional opinion of Dr. Park.[98]  In that regard, the ALJ summarized in some detail the findings of Dr. Park's April 2013 mental status questionnaire, which noted no delusions, good insight and judgment, good ability to remember, understand and follow directions, and no deficits with attention or concentration.[99]  The ALJ also explicitly stated that Dr. Park also found that Owens may have difficulty interacting with others due to anger issues.[100]  The ALJ then assigned this opinion significant weight, finding that it was supported by sufficient clinical findings and consistent with objective evidence in the medical record.[101]

---

in December 2013 (this time to see Dr. Abraham) [*id.*], the same doctor he saw "[a]t a follow-up visit [to MHS] in June 2014." *Id.*

[97] *West v. Comm'r of Soc. Sec.*, No.1:14 CV 672, 2015 WL 691313, at * 7 (N.D. Ohio Feb. 18, 2015)(internal quotation and citations omitted).

[98] Tr. at 26.

[99] *Id.*

[100] *Id.*

[101] *Id.*

Owens here seeks to question or minimize the ALJ's decision to give significant weight to the opinion of Dr. Park on the grounds that subsequent treatment notes from Dr. Park show complaints of hallucinations and some risk of suicide, as well as the fact that Dr. Park gave Owens a GAF score of 45 in March of 2013.[102]  Implying that a March GAF score somehow contradicts a full functional opinion given a month later is a logically difficult step. Further, as Owens himself acknowledges, the existence of some notes from subsequent treatment sessions that reflect complaints of "hallucinations urging [Owens] to be violent," were actually addressed by Dr. Park in the very functional assessment considered by the ALJ, which "noted a history of violence and a potentially moderate risk for suicide."[103]

Accordingly, no error occurred  in the ALJ's use of  Dr. Park's opinion in fashioning the RFC.

c.    *State agency reviewers*

Owens here maintains that the ALJ's purported "mishandling" of the opinions of the non-examining state agency reviewers "created numerous inconsistencies [in the opinion] that remain unresolved.[104]  In particular, Owens contends that it was a "problem" that the state agency consultants relied on an incorrect date for when Owens was last insured, and

---

[102] ECF # 12-1 at 13.

[103] *Id.*

[104] *Id.* at 15.

that the ALJ failed to account for all of the functional limitations contained in the state agency reviewers's opinions.[105]

As the Commissioner notes, however, the state agency reviewers did consider evidence after September 2012, the supposedly erroneous date of last insured.[106] Specifically, the Commissioner observes that the state agency psychologists "made particular note of [Owens's] history of mental health treatment, as well as his April 2013 consultative psychological evaluation."[107]  In that regard, Owens makes no further mention of this argument in his reply brief.[108]

Owens further argues that the ALJ failed to fully incorporate the limitation of the state agency reviewers that he only perform a "static series of tasks."[109]  He asserts that the actual limitation in the RFC - that Owens be restricted to "one-to-three step tasks performed in a static environment" - is not the same thing.[110]  Essentially, Owens contends that the original limitation is directed to "tasks" while the RFC goes to the environment where the tasks are

---

[105] *Id.*

[106] ECF # 18 at 16.

[107] *Id.* (citing transcript).

[108] ECF # 19.

[109] *Id.* at 4.

[110] *Id.*

done.[111]  To that point, he further argues that "one-to-three step tasks" is not a "static" environment, in that such a term means "unchanging duties or activities."[112]

Even by Owens's own definition of "static" as "unchanging," it is difficult to see why an unvaried, unchanging three-step task does not qualify as static, or why work limited to a task with a small number of variables cannot also be said to be "unchanging" if the universe of variables is small, fixed and so cannot be changed.  Thus, by itself, Owens's observation - made without citation to any authority - does not prove that the RFC limitation is in any meaningful way at variance with the opinion of the state agency reviewers. When the full RFC is considered - with its reference to simple tasks done in a "static environment" - Owens's argument becomes even more tenuous, since the RFC itself states that the simple tasks are to be done in an unchanging setting.

d.     *Richard Davis, Ph.D.*

Owens argues here that the ALJ did no more than list the findings of Dr. Davis's examination and then failed to assign any weight to those findings or indicate which findings, if any, were incorporated into the RFC.[113]

Although the Commissioner seems to tacitly accept the factual premises of Owens's argument, she nevertheless maintains that they all constitute harmless error because the ALJ

---

[111] *Id.* at 4-5.

[112] *Id.* at 5.

[113] ECF # 12-1 at 16-17.

ultimately incorporated limitations into the RFC that "adequately" encompassed Dr. Davis's opinions.[114]

In this case, as with the ALJ's analysis of Nurse Kimble, that the ALJ's treatment of Dr. Davis's opinion cannot be reviewed in any meaningful way. No weight was assigned to Dr. Davis's opinion; no analytical bridge was created to link any particular finding in his report with any specific restriction in the RFC; and no reasons or explanations were articulated to afford any meaningful guidance to the reviewing court seeking to understand what role, in any at all, Dr. Davis's opinion played in the disposition of this claim.

This treatment of Dr. Davis is somewhat more troubling than usual in that Dr. Davis was the state agency's own examining psychologist, who personally examined Owens and produced a comprehensive six-page report of his clinical findings along with a functional assessment.[115]  Although the ALJ obviously felt constrained to include a detailed summary of Dr. Davis's findings in the opinion, it is equally obvious, though without explanation as to why, that he did so without any statement of weight assigned or clear indication of how, if at all, his functional assessment played a role in formulating the RFC.

That said, however, the ultimate issue for a reviewing court is whether substantial evidence supports the findings of the Commissioner.  The fact that Dr. Davis's opinion may have been poorly handled is harmless error unless it can be shown that such mishandling resulted in a decision that lacked the support of substantial evidence.  Here, that conclusion

---

[114] ECF # 18 at 17.

[115] Tr. at 374-379.

is not possible because there is no evidence that Dr. Davis's opinion had any role at all in formulating the final decision and the decision itself has the support of the opinion of Dr. Park and from the state agency consultants.[116]

Accordingly, the ALJ's handling of Dr. Davis's opinion resulted in no finding or action that could be judicially reviewed in a meaningful way or, more importantly, resulted in anything that had an effect on the question of whether the Commissioner's decision was supported by substantial evidence.

e.    *GAF scores*

Here, without citation to case authority or regulations, Owens argues first that GAF scores from acceptable medical sources should be analyzed as an opinion from that source, requiring adherence to the rule for such opinions applicable to the source.[117]

The Sixth Circuit has stated that a "GAF score is a 'subjective rating of an individual's overall psychological functioning' which may assist an ALJ in assessing a claimant's mental RFC."[118] To that end, the Sixth Circuit has also stated that "GAF scores are 'not raw medical data,' and the Commissioner has declined to endorse the [GAF] score for use in 'Social Security benefit programs.'"[119] That said, "although a GAF score is 'not

---

[116] *See*, ECF # 12-1 at 16. "Here, it is unclear if the ALJ even remotely relied on Dr. Davis's findings."

[117] ECF # 12-1 at 17-18.

[118] *Miller v. Com'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016)(internal citation omitted).

[119] *Id.* at 835-36 (internal citations omitted).

-23-

essential to the RFC's accuracy,' it nevertheless 'may be of considerable help to the ALJ in formulating the RFC.'"[120]   Accordingly, the Sixth Circuit teaches that reviewing courts should "take a case by case approach to the value of GAF scores."[121]

In *Kornecky v. Commissioner of Social Security*[122] the Sixth Circuit noted that "according to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning."[123]  *Kornecky* also observed that "[i]f other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF is as low as [46-55] or even lower."[124]

*Miller* summarized the concerns regarding GAF scores expressed in *Kornecky* as being: (1) "reason[s] to doubt the credibility of the assessing source;" (2) "the claimant had conflicting GAF scores;" (3) "the GAF scores were not accompanied by a suggestion that the claimant could not perform any work;" (4) substantial evidence supported the conclusion that the claimant was not disabled;" and (5) a "VE testified that an individual with the claimant's limitations could still perform a number of jobs."[125]  On the other hand, *Miller* also noted that

---

[120] *Id.* at 836 (internal citations omitted).

[121] *Id.*

[122] *Kornecky v. Comm'r of Soc. Sec.,* 167 Fed. Appx. 496 (6th Cir. 2006).

[123] *Id.* at 836.

[124] *Id.*

[125] *Miller*, 811 F.3d at 836.

-24-

the Sixth Circuit "has looked to the consistency among low GAF scores to determine if the ALJ has minimized the severity of a claimant's symptoms and failed to provide good reasons for assigning limited weight to a treating doctor's opinion," and "also looked to the inconsistency between one doctor's assigned GAF score and a different doctor's opinion as a proper basis for rejecting the latter doctor's opinion."[126]

*Miller* endorses the view that a GAF score is opinion evidence. Indeed, *Miller* found that the ALJ in that case assigned limited weight to three consist GAF scores of 49-50[127] on the improper grounds that the claimant's daily activities showed a capacity for regular, continuing work.[128]  Because such isolated and periodic daily activities as interacting with his family were not equivalent to the kind of sustained activities needed for the workplace, those daily activities 'do[] not offset the records consistency with regard to [the claimant's] assigned GAF scores and is an insufficient basis to determine that [the claimant] could conduct work activities on a sustained basis..."[129]

---

[126] *Id.* (citations omitted).

[127] The scores were given by a social worker, and two examining psychiatrists. *See, id.* at 829-30.

[128] *Id.* at 838.

[129] *Id.*

In this case, a treating source, Dr. Park, assigned Owens a GAF score of 45,[130] as did Dr. Davis, a state consulting psychologist.[131] Moreover, Nurse Kimble assigned Owens a GAF score of 50.[132]  The ALJ gave "little weight" to these scores, noting that only one of the scores was from a doctor, and further noting that the scores "seem out of proportion" to the limitations expressed in Owens's activities and social functioning, as well as observing that "the evaluators did not explain how the low GAF's [*sic*] were assessed."[133]

Initially it may seem puzzling that the ALJ assigned "significant weight" to Dr. Park's overall opinion but gave only "little weight" to Dr. Park's GAF score.  But, as is revealed by closer examination, the opinion given significant weight was in the form of answers to a mental status questionnaire and was completed in April 2013,[134] while the GAF score was assigned a month earlier in March 2013 as part of Dr. Park's initial evaluation.[135]  Further, and as explicitly stated by the ALJ, the raw GAF score of 45 "seem[ed] out of proportion" with the specific  functional limitations expressed in the answers to the April questionnaire. Nothing in the case law prohibits reliance on the later, more specific functional assessment over an earlier, more general finding. More importantly, unlike the April assessment, the

---

[130] Tr. at 25.

[131] *Id.* at 26.

[132] *Id.* at 29.

[133] *Id.*

[134] *Id.* at 26.

[135] *Id.* at 392.

March GAF was not accompanied by any particular findings on Owens's capacity to engage in any kind of work, a defect, as noted, that the *Miller* court found was an acceptable reason for discounting the weight given to a particular GAF score. Thus, there was no error by the ALJ as regards the GAF score given by Dr. Park.

As to the treatment of the GAF score of Nurse Kimble, the ALJ correctly observed that she is not an acceptable medical source. Further, as noted earlier, substantial evidence from Dr. Park's functional opinion provides a basis for concluding that Nurse Kimble's GAF score of 50, which is higher than that given by Dr. Park, do not support a functional limitations greater than those expressed by Dr. Park. Therefore, there was no error in how the ALJ assessed the GAF score provided by Nurse Kimble.

The situation with Dr. Davis is not as straightforward. As noted above, the ALJ provided a fairly detailed description of Dr. Davis's findings and then made no assignment of weight. And it is unclear to the degree, if any, that the ALJ relied on Dr. Davis's functional limitation opinion. But, that opinion itself is not a model of clarity. In particular, in the six page report there are very few, if any, direct links established between clinical details, such as the observation that Owens presented with "vagueness of effect," and any specific, particular work limitations.[136]

In sum, as the *Miller* court found, an ALJ may properly decline to give significant weight to a GAF score that is not accompanied by evidence of work-related limitations

---

[136] *See, e.g.*, *id*. at 377 (Owens is "extremely limited" in his capacity to think logically) and 378 (Owens not "going to be able to deal with much stress or pressure.").

and/or to one contradicted by substantial evidence that the claimant is not disabled. Because both of those situations apply in the case of Dr. Davis, there was no error in how the ALJ handled the GAF score he assigned to Owens.

Finally, as Owens's notes, the GAF scores are consistent, with two scores of 45 and one of 50. But that does not compel the conclusion Owens suggests. As *Kornecky* teaches, if there is substantial evidence that Owens is not disabled, such as there is with Dr. Park's April 2013 functional opinion and those of the state agency consultants, the reviewing court "may not disturb the denial of benefits" to a claimant whose GAF score is as low as 40-45.[137]

In sum, substantial evidence supports the findings of the ALJ as to mental limitations.

## 2.  *Physical limitations*

The ALJ found that Owens had no severe physical impairments and included no limitations for physical impairments[138] and included no limitation for physical impairments on the RFC.[139]  Owens argues that his osteo-arthritis should have been found as a severe impairment at Step 2 and appropriate limitations incorporated in the RFC at Step 4.

Owens based his challenge on the argument that the ALJ violated the treating physician/good reasons rule when he gave only limited weight to the functional opinion of Dr. James Brown, M.D., Owens's treating primary care physician.[140]

---

[137] *Kornecky*, 167 Fed. Appx. at 511.

[138] Tr. at 22.

[139] *Id.* at 24.

[140] ECF # 12-1 at 20-24.

-28-

Dr. Brown completed a an arthritis medical source statement form in 2014.[141]  In that

form, and as noted by the ALJ, Dr. Brown assessed Owens as having significant physical

limitations, including that he would be off task for more than 25 percent of the workday and

would likely be absent for more than four days per month.[142]  The ALJ concluded that this

opinion should be given limited weight because "the limitations identified by Dr. Brown are

out of proportion with the unremarkable consultative examinations findings [by Dr. Hassan

Assaf, M.D.] and there is nothing in Dr. Brown's own treatment notes that would support

such limitations."[143]

Owens initially contends that the ALJ erred by concluding simply that Dr. Brown's

opinion is out of proportion to his own notes.[144]  In fact, and as can clearly be seen from the

portion of the ALJ's opinion cited above, the "out of proportion" comment was in reference

to the findings of Dr. Assaf, not Dr. Brown. There, the ALJ had just noted that Dr. Assaf had

found on examination that the physical examination was normal.[145]  Moreover, as to the

consistency of Dr. Brown's opinion with his own notes, which is also referenced by the ALJ,

the ALJ specifically mentioned those treatment records just a few sentences before assigning

_____

[141] Tr. at 400-403.

[142] *Id.*; *id.* at 22.

[143] *Id.* at 23.

[144] ECF # 12-1 at 22.

[145] *Id.*

-29-

weight to Dr. Brown's opinion.[146]  The ALJ observed that Dr. Brown's records showed that x-rays of Owens's "hips and right shoulders showed osteoarthritis in the hips and osteophyte formation in the right shoulder. X-rays of the knees and left shoulder were normal."[147] More importantly, the ALJ found from Dr. Brown's records that Owens "had been treated conservatively with pain medication. Notably, he never sought or received treatment from a specialist; all treatment has been rendered by a general practitioner."[148]  In addition, and within this discussion, the ALJ noted that Dr. Assaf "concluded that [Owens] had no [physical] limitations."[149]

From the analysis in the opinion recited above, it is not correct to state that the ALJ devalued Dr. Brown's opinion solely on the basis of general, unspecific comments that Dr. Brown's opinion was not supported by his treatment notes.  In fact, the ALJ specifically cited to Dr. Brown's records as showing the arthritis being limited to Owens's hips and right shoulder, with his knees and left shoulder as normal.   Moreover, as also discussed above, the ALJ noted that Dr. Brown's records showed only conservative pain management therapy and did not show the involvement of any specialist.  While it will be considered below whether these points are sufficient to justify why Dr. Brown's functional opinion received

---

[146] *Id.*

[147] *Id.* (citing transcript).

[148] *Id.*

[149] *Id.*

-30-

only limited weight, these reasons are undoubtedly clearly stated and linked directly to the clinical record and treatment history.

In the end, and as Owens appears to recognize,[150] the main reason the ALJ did not give greater weight to Dr. Brown's opinion was the contrary opinion of Dr. Assaf, and of the state agency consultants.[151] In that regard, Owens initially asserts, citing *Gayheart v. Commissioner of Social Security*,[152] that "discrediting a treating source for being inconsistent with other examining evidence violates" the treating physician rule stated in *Gayheart*.[153] In fact, *Gayheart* teaches and the regulations provide that in order to give greater weight to the opinion of an examining source over that of a treating source the treating source opinion may not be examined with greater scrutiny than was the examining opinion and good reasons must be given for such a decision.[154]

Here, there is no evidence that Dr. Assaf's opinion was subjected to greater scrutiny than that of Dr. Brown, and the ALJ plainly cited reasons, noted above, as to why Dr. Brown's more limiting opinion should be afforded less weight. But, that said, the ALJ does fail to address the developments that transpired between when Dr. Assaf's opinion was given

---

[150] *See*, ECF # 12-1 at 23.

[151] *Id.*

[152] *Gayheart*, 710 F.3d 365 (6th Cir. 2013).

[153] ECF # 12-1 at 22.

[154] *Gayheart,* 710 F.3d at 380 (citations omitted).

in April 2013 and when Dr. Brown's opinion was given in November 2014.[155] Specifically, Dr. Brown's notes from September and November 2014 both show that Owens was experiencing arthritis pain despite his medication. [156] Dr. Brown gave his functional opinion in November 2014.[157]  Thus before preferring Dr. Assaf's opinion to that of Dr. Brown, the ALJ should have considered the functional effect of continuing pain despite medication, a later development and continuing element that was not considered by Dr. Assaf, who conducted a single examination.

Therefore, the ALJ did err in assigning greater weight to the earlier functional opinion of Dr. Assaf over the later opinion of Dr. Brown, a treating source. Although the ALJ did articulate reasons for this decision, the reasons were not good ones.  This error deprives the findings of no severe physical impairments at Step 2 and no physical limitations at Step 4 of the support of substantial evidence.

## Conclusion

For the reasons stated, I recommend finding that the decision of the Commissioner denying benefits to Herbert C. Owens is not supported by substantial evidence as is set forth above. Thus, I recommend that the matter be remanded for further proceedings consistent with this Report and Recommendation.

---

[155] *See*, Tr. at 22.

[156] *Id.* at 405, 407.

[157] *Id.* at 405.

Dated: June 30, 2017                              s/ William H. Baughman, Jr.
                                                  United States Magistrate Judge


## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.[158]

---

[158] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).